15 cv 02957

Counsel of Record:
ANDREW M. CALAMARI
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov



RECEIVED
APR 16 2015
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

-against-

MICHAEL J. OPPENHEIM,

    Defendant,

-and-

ALEXANDRA OPPENHEIM,

    Relief Defendant.
-------------------------------------------------------------x

15 Civ. ( )

**COMPLAINT**

**ECF CASE**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Michael J. Oppenheim ("Oppenheim"), and Relief Defendant Alexandra Oppenheim ("Alexandra Oppenheim"), alleges:

## SUMMARY

1.     This case involves the theft by an investment adviser and broker of at least $20 million from his customers to fund his own brokerage accounts in a scheme that spanned more than three years. While employed as a "private client advisor" at a major New York financial

institution (the "Bank"), Oppenheim used his position to persuade at least two customers to withdraw a total of over $12 million out of their accounts on the promise that he would use the withdrawals to purchase safe and secure municipal bonds for their accounts. Instead, Oppenheim bought himself cashier's checks and deposited them into his own brokerage account or an account he controlled in the name of his wife, Relief Defendant Alexandra Oppenheim. After each theft and deposit, and in short order, Oppenheim lost the bulk of the stolen funds in highly unprofitable options trading.

2. To cover up his fraud, and ensure that he could continue it, Oppenheim took steps to hide his theft from his customers, including creating fake account statements and transferring money from one customer's account to another's to replenish amounts he had stolen earlier. For example, in one instance, Oppenheim created false "account statements," to persuade one of these customers that he had bought the municipal bonds he had undertaken to buy for his account. Thus, when "Customer A" asked for a recent statement reflecting his municipal bond holdings, Oppenheim simply pasted Customer A's name onto an account statement reflecting the legitimate holdings of another customer, and forwarded it on to Customer A. In another instance, without authorization from Customer A, Oppenheim transferred money from Customer A to "Customer B" to make up for a shortfall created by his previous theft from Customer B.

3. In engaging in this scheme, Oppenheim has violated (and unless permanently enjoined and restrained, will continue to violate) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

4. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9, seeking a final judgment: (a) permanently restraining and enjoining Oppenheim from engaging in the acts, practices and courses of business alleged herein; (b) requiring Oppenheim and Alexandra Oppenheim to disgorge ill-gotten gains and to pay prejudgment interest thereon; and (c) imposing civil money penalties on Oppenheim pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

6. Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1391. Defendant, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein. Defendant engaged in many of the acts and transactions alleged herein through communications with customers in this District.

## THE DEFENDANT

7. **Oppenheim**, age 48, resides in Livingston, New Jersey. Except for a three month period when Oppenheim worked for a competitor, Oppenheim was employed by the Bank from

3

February 11, 2002 through March 18, 2015, most recently as a Vice President and Private Client Advisor. He was a registered investment adviser representative and registered representative of an affiliate of the Bank, and worked out of the Bank's offices in mid-town Manhattan. On March 18, 2015, the Bank terminated Oppenheim's employment. Oppenheim has spent the bulk of his career in the financial services industry.

## THE RELIEF DEFENDANT

8.  **Alexandra Oppenheim**, age 47, resides in Livingston, New Jersey, and is Oppenheim's wife. Oppenheim controlled at least one account opened in her name at Broker 1, deposited some of his customers' monies into that account between March and August 2011, and then placed trades in that account. Additionally, some of the wire transfers out of Oppenheim's trading accounts were directed to joint bank accounts in Oppenheim's and Alexandra Oppenheim's names.

## FACTS

9.  Since 2004, Oppenheim has been a registered investment adviser representative and registered representative associated with the Bank's Commission-registered broker-dealer affiliate with an office in Manhattan. In his role as Private Client Advisor, Oppenheim has provided banking, brokerage and investment advisory services to 500 Bank customers, largely high net worth individuals.

10. From at least March 2011 until October 2014, Oppenheim deposited approximately $20 million into brokerage accounts he controlled in either his own name or that of his wife, Alexandra Oppenheim, at two broker-dealers, Broker 1 and Broker 2. All of these deposits were in the form of cashier's checks and all were drawn on accounts of Oppenheim's Bank customers. The cashier's checks ranged from $270,000 to almost $2 million.

4

11.     With respect to both Customer A and another Oppenheim Bank customer, "Customer C," Oppenheim obtained their written approval to withdraw the amounts Oppenheim later deposited into his own brokerage account by falsely promising them that he would use the money to purchase municipal bonds on their behalf in their accounts.[1]  Neither Customer A nor Customer C ever authorized Oppenheim to withdraw his money to fund Oppenheim's trading in his own brokerage accounts.  Nor did either ever learn that Oppenheim was doing so until after Oppenheim was terminated by the Bank.

**Oppenheim's Misappropriation from Customer A**

12.     Sometime in 2011, Customer A's accountant met with Oppenheim to discuss investing a portion of Customer A's assets in safe, secure and non-volatile securities. Oppenheim proposed that Customer A invest in a New York municipal bond mutual fund offered through the Bank's broker-dealer affiliate.

13.     Beginning in November 2011, Oppenheim directed a Bank employee to take blank withdrawal slips to Customer A's office in Manhattan for Customer A's signature, ostensibly to authorize the use of Customer A's cash to purchase shares in the municipal bond mutual fund that Customer A had agreed to buy.  On or about November 21, 2011, February 2, 2012, September 6, 2012, September 20, 2012 and December 20, 2012, Customer A signed blank withdrawal slips ranging from $300,000 to $1.9 million, and totaling more than $5 million, each time believing, as Oppenheim had represented, that Oppenheim was using these funds to purchase shares in the Bank's New York municipal bond mutual fund.

---

[1]     Customer C was both a brokerage customer and an investment advisory client of Oppenheim's through the Bank's affiliate with which Oppenheim was associated as a registered investment adviser representative and a registered representative.

5

14.     Instead, and on each occasion, Oppenheim took Customer A's signed withdrawal slips, entered Broker 2 as the payee, and presented them to a Bank employee to buy cashier's checks, which he then deposited in his own trading account at Broker 2.

**Oppenheim's Misappropriation from Customer C**

15.     Customer C has been a Bank customer for over three decades and holds many different accounts at the Bank. Approximately six years ago, after suffering some investment losses, Customer C met with Oppenheim to discuss his investments and investment strategy. Oppenheim proposed that Customer C invest in one of the Bank's investment programs that would offer him a managed portfolio of municipal bonds. Oppenheim promoted the program as much less volatile than an investment in equities. Customer C agreed to the investment in the managed account program Oppenheim proposed. The managed account program paid Oppenheim a quarterly advisory fee, calculated as a percentage of Customer C's assets invested in the program.

16.     Beginning in April 2013, Oppenheim periodically visited Customer C to obtain his signature on blank withdrawal slips that he told Customer C would be used to make additional investments in the municipal bond managed account program. On or about April 8, 2013, April 22, 2013, January 2, 2014, January 21, 2014, February 25, 2014, March 21, 2014 and April 8, 2014, Customer C signed blank withdrawal slips for amounts ranging from $800,000 to $1.4 million, and totaling more than $7.5 million.

17.     Instead of using Customer C's signed withdrawal slips to fund additional investments in the managed account program on Customer C's behalf, as he represented, Oppenheim instead wrote the name of Broker 1 or Broker 2 as the payee on the withdrawal slips, and presented them to a Bank employee to obtain cashier's checks payable to either Broker 1 or

6

Broker 2. Oppenheim then deposited those checks in his own trading account at Broker 1 or Broker 2.

**Oppenheim's Cover Up**

18. Both Customer A and Customer C trusted Oppenheim. As a result, Customer A never questioned why he did not receive regular account statements for his municipal bond mutual fund. When Customer C's accountant asked Oppenheim for a 1099 tax form reflecting his municipal bond managed account program positions, Oppenheim told him that no 1099 was necessary since the portfolio consisted only of tax-free bonds, an explanation Customer C's accountant accepted.

19. In addition to providing false explanations for missing account and year-end tax statements, Oppenheim took other steps to hide his fraudulent conduct from customers. For example, in the beginning of 2013, when Customer A was considering purchasing a home and was pricing possible mortgage loans, he asked Oppenheim to send him an account statement for his municipal bond mutual fund that his potential lenders had requested. In response, Oppenheim faxed him an account statement showing that Customer A held more than $8 million in various New York municipal bonds.

20. While the account statement Oppenheim faxed reflected Customer A's name and other identifying information, including account number, in fact, it was an account statement for a completely unrelated third party, on to which Oppenheim had simply pasted Customer A's name and account number.

21. In late 2014 and early 2015, Customer A again asked for an account statement, this time to support a personal financial statement that he needed in connection with an application he was submitting for a line of credit. Oppenheim again complied, faxing an account

7

statement to Customer A's office in Manhattan reflecting that Customer A held a sizeable position in New York municipal bonds. But, like the 2013 account statement, the account statement Oppenheim sent Customer A was actually one for an unrelated Bank customer on which Oppenheim had pasted Customer A's identifying information.

22. Oppenheim also avoided detection by replenishing victims' depleted account balances with money he transferred (without authorization) from other victims' accounts. For example, after making two unauthorized withdrawals totaling $765,000 from Customer B's account, and corresponding deposits into his own accounts at Broker 2 in October 2011, Oppenheim replaced that money by making an unauthorized transfer of $765,000 from Customer A's account into Customer B's account on November 15, 2011.

**Oppenheim's Trading Losses Financed with the Stolen Customer Funds**

23. Almost immediately after each deposit of Customer A's and Customer C's stolen funds into his brokerage accounts, Oppenheim embarked on sizeable trading of stocks and options, including Tesla, Apple, Google and Netflix. Soon after each deposit, Oppenheim typically lost the entire amount of the deposit, and his accounts at Broker 1 and Broker 2 currently show minimal cash balances.

24. In his account at Broker 1, Oppenheim's trading resulted in losses of approximately $13.5 million in 2014 alone.

25. When Oppenheim did have positive cash balances in his Broker 1 or Broker 2 accounts, he sometimes wired the funds out to bank accounts in his name or to accounts he held jointly with his wife, Alexandra Oppenheim. At least one outgoing wire was used to pay off a portion of the mortgage on his and his wife's home in New Jersey. To the extent that Alexandra

Oppenheim received any of the ill-gotten gains Oppenheim obtained from Customer A or Customer C, she had no legitimate claim to them.

### FIRST CLAIM FOR RELIEF
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a), (b) and (c) Thereunder Against Oppenheim)

26. Paragraphs 1 through 25 are re-alleged and incorporated by reference as if fully set forth herein.

27. From at least November 2011 through March 2015, Oppenheim, in connection with the purchase or sale of securities, directly or indirectly, singly or in concert with others, with scienter, by use of the means and instrumentalities of interstate commerce or of the mails, has employed devices, schemes and artifices to defraud; has made untrue statements of material fact and has omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and has engaged in acts, practices and courses of business which operate or would operate as a fraud and deceit upon investors.

28. By virtue of the foregoing, Oppenheim violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), (b) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) and 240.10b-5(c).

### SECOND CLAIM FOR RELIEF
### (Violations of Sections 206(1) and (2) of the Advisers Act Against Oppenheim)

29. Paragraphs 1 through 28 are re-alleged and incorporated by reference as if fully set forth herein.

30. From at least April 2013 through March 2015, Oppenheim, as investment adviser to Customer C, directly or indirectly, singly or in concert with others, with scienter, by use of the means and instrumentalities of interstate commerce or of the mails, has employed devices, schemes and artifices to defraud Customer C, and has engaged in transactions, practices and courses of business which operated as a fraud and deceit upon Customer C.

31. By virtue of the foregoing, Oppenheim has violated and, unless restrained and enjoined, will continue violating, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

### THIRD CLAIM FOR RELIEF
### (Against Relief Defendant Alexandra Oppenheim)

32. Paragraphs 1 through 31 are re-alleged and incorporated by reference as if fully set forth herein.

33. Relief Defendant Alexandra Oppenheim received ill-gotten funds transferred to her or for her benefit by Oppenheim.

34. Relief Defendant Alexandra Oppenheim has no legitimate claim to the ill-gotten funds she directly or indirectly received from Oppenheim.

35. By virtue of the foregoing, Relief Defendant Alexandra Oppenheim should be required to disgorge the amounts she directly or indirectly received from Oppenheim.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Oppenheim, and each of his agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 and Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

### II.

Ordering Oppenheim and Alexandra Oppenheim to disgorge ill-gotten gains received as a result of the conduct alleged herein, plus prejudgment interest thereon.

### III.

Ordering Oppenheim to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

## IV.

Granting such other and further relief as this Court deems just and appropriate.

Dated: April 16, 2015
New York, New York

                                SECURITIES AND EXCHANGE COMMISSION

                                By: /s/ Nancy A. Brown
                                Andrew M. Calamari
                                Regional Director
                                Nancy A. Brown
                                200 Vesey Street, Suite 400
                                New York, New York 10281-1022
                                Tel:   (212) 336-1023 (Brown)
                                Email: brownN@sec.gov

                                Attorneys for Plaintiff

Of Counsel:
Amelia A. Cottrell
Charles D. Riely
William J. Martin